IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID EUGENE LANCASTER,

    Petitioner,                   No. CIV S-06-1008 LKK GGH P

    vs.

WARDEN KANE, et al.,

    Respondents.                FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

    Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1991 petitioner was convicted of second degree murder following a jury trial. He is serving a sentence of 15 years to life.

    Petitioner challenges the 2004 decision by the California Board of Parole Hearings (BPH) finding him unsuitable for parole on several grounds. This was petitioner's first subsequent parole hearing, i.e. his first suitability hearing after his initial parole consideration hearing.

    After carefully considering the record, the court recommends that the petition be denied.

/////

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. <u>Id</u>. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

2

1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The reasoned opinion of the Superior Court of San Joaquin County addressing petitioner's habeas petition raising the claims raised in the instant action addressed only his insufficiency of the evidence claim. Answer, Exhibit 5. The California Court of Appeal and California Supreme Court summarily denied petitioner's state habeas petition. Answer, Exhibits 6, 7. Accordingly, the court considers whether the Superior Court's denial of petitioner's claim alleging insufficient evidence was an unreasonable application of clearly established Supreme Court authority. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court "looks through" the summary

1  disposition to the last reasoned decision).  Because petitioner's other claims were summarily

2  denied, the court will independently review the record to determine whether the denial of these

3  claims was an unreasonable application of clearly established Supreme Court authority.

4  III.  Factual Background

           A summary of petitioner' offense is contained in opinion of the California Court of Appeal affirming petitioner's conviction:

> At approximately 6 p.m., October 25, 1990, defendant and David Stricklin were sitting on the front porch of Stricklin's uncle's residence when Alicia Bulmer, her brother Kiefer Roland, and Rachel Stors walked past. Defendant called out that one of the girls had a "cute ass," a comment to which the passing trio took offense.  There ensued a verbal confrontation between defendant and the threesome, which resulted in talk of a fight at a nearby park.  As the trio headed for the park, defendant donned his jacket containing a .25 caliber handgun, and followed.  David Stricklin and his cousin Larry Stricklin, who had just arrived and heard the exchange, followed the defendant.
>
> At the park, Roland contacted several of his friends and told them of the problem.  One of them broke a bottle and the group started toward defendant, who was by this time, standing at the edge of the park. [Footnote omitted.] When the group got within 20 to 30 feet of defendant, defendant pulled the gun from his pocket.  At the sight of the gun, the group, with the exception of Danny Tupas and Carlos Martinez, scattered.  Tupas and Martinez, from a distance of about 25 feet from defendant, began jumping up and down, yelling "Shoot me, shoot me."
>
> Defendant pointed the gun in the general direction of Tupas and Martinez and fired 5 shots.  Tupas ran toward his friends calling out he had been "hit."  Tupas fell, arose, fell again, and then died.
>
> After the shooting, defendant followed the Stricklins back to the residence where he warned them not to tell on him and asked them to hide the gun.
>
> During the early morning hours of October 26, defendant was questioned by Officers John Williams and Theodore Montes.  Defendant admitted initiating the confrontation by commenting that one of the girls passing had a cute ass, which resulted in the male challenging him.  Defendant followed them to the park, saw them converse with a group and then observed the group start toward him.  He believed one of the group had a bottle and another had a stick.  When he pulled out the gun the group scattered, except for Tupas whom he believed had the bottle.  Tupas began yelling, "Shoot me."  Defendant, thinking the safety was on and only intending to scare Tupas, aimed "to the left and down at the ground and then pulled the trigger," firing 2 to 3 shots.  Not realizing he had hit anybody defendant walked back to the house.
>
> An autopsy performed on Tupas disclosed he suffered two bullet wounds–a graze to his chin and an entry to his chest, which caused his death.  Five .25 caliber

      casings were found at the scene; three were determined to have been fired from his gun and the other two might have been.

      Although defendant did not testify, he played a tape recording of his statements made to Officers Montes and Williams, confirming the officers testimony, including defendant's lack of intent to shoot anybody. Defendant also called a police officer who was an expert in gang affiliation, who testified that Roland, Martinez and Tupas were gang members.

Traverse, Exhibit B, pp. 2-4.

IV.  <u>Discussion</u>

      The BPT found petitioner unsuitable for parole based on the following reasons:

      First we have the offense – carried out in an exceptionally violent and brutal manner. There were multiple victims; one was killed. The offense was carried out in a manner which demonstrates a disregard for human life.
      ***
      The inmate does have a prior arrest for grand theft auto receiving three years probation...He was on probation at the time of the instant offense.
      ***
      The psychological evaluation...is somewhat inconclusive....
      ***
      The inmate has recently committed a serious 115, this was committed on 8-24-03, it was mutual combat.

Board of Prison Terms Decision at 59-60.

      A.  <u>Insufficient Evidence: Claims 1, 3, 4, 7</u>

      In claim one, petitioner argues that the BPH's finding of an "unreasonable risk of danger" to support the finding of unsuitability was a misapplication of statutory authority. In particular, petitioner argues that there was not sufficient evidence to support this conclusion. The court construes this claim as a challenge to the sufficiency of the evidence to support the finding of unsuitability.

      In claim three, petitioner argues that the BPH's reliance on "public safety" to create an assumption of unsuitability is improperly based solely on the gravity of his commitment offense. Petitioner argues that his actual suitability for parole should not hinge entirely on his commitment offense, but should include consideration of other factors. The court construes this

5

claim as a challenge to the sufficiency of the evidence to support the finding of unsuitability.

Claim four alleges that the BPH improperly relied solely on the circumstances of the commitment offense to find him unsuitable for parole. The court construes this claim as a challenge to the sufficiency of the evidence to support the finding of unsuitability.

Claim seven alleges that the BPH violated his right to due process by ordering that his psychological report, which stated that he had a lower than average violence potential, be amended. The court construes this claim as a challenge to the sufficiency of the evidence to support the finding of unsuitability.

Since the approximate five years since the issuance of McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), we know this about the liberty interest implicated by California's parole laws regarding indeterminate sentences, i.e., parole suitability hearings, which if successful for the petitioner, will result in the establishment of an actual parole date (but never less than the minimum term):

1. A liberty interest exists, Irons v. Carey, No. 05-15275, 2007 WL 2027359 (9th Cir. July 13, 2007) citing cases;

2. Reliance on unchanging factors in denying parole suitability *might* implicate a violation of that liberty interest. Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003);

3. A finding by the Board of Parole Hearings (formerly BPT) (or at a later time, by the Governor) concerning the circumstances or gravity of the crime in and of itself is sufficient to deny suitability; In re Rosenkrantz, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d 104, 161; Irons, at * 5; but the nature of the offense must be "particularly egregious" to constitute a basis to deny parole suitability. Rosenkrantz, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161.

4. However, "particularly egregious" means nothing more than finding elements in excess of those "minimally necessary to convict." In re Dannenberg, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005);

\\\\\

5. If the petitioner has served less than the minimum term of his indeterminate sentence, "all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Irons at * 6, but see footnote 1 of Irons expressing no opinion if the prisoner has served more than his minimum term, i.e., *maybe* that is the time frame against which reliance on unchanging factors is truly suspect[1];

6. If the BPH determined that the crime was vicious, or performed in a callous manner, or the motive was trivial, and so forth – all factors relating to the circumstances of the crime – and such is adopted by the state courts on review, a federal court must find the state court decision(s) AEDPA-unreasonable before a writ of habeas corpus may be granted. Irons, supra.

With respect, after Irons, the undefined "mights" and "maybes" serve as an indecipherable present guide to knowing just when the liberty interest in parole may be violated by reliance on unchanging factors. Moreover, one does not know whether such reliance, if it is ever held to be insufficient, is based on passage of time alone, or is an uncertain blend of crime circumstances and passage of time. The state courts' adoption of the BPH (BPT[2]) or Governor's decision about the circumstances of the crime is now essentially unreviewable – at least prior to the expiration of the minimum term. That is, the circumstances of the crime in terms of viciousness, callousness, triviality and the like, is essentially an unchanging value judgment whose correctness cannot often be disputed regardless of the time when such a judgment is made

---

[1] Nothing in California statutes or regulations, see Cal. Penal Code 3041, 15 CCR § 2402, would expressly so limit the decision of the BPH and Governor, thus the potential limitation must be of federal origin. However, as undue reliance on unchangeable factors has never been found thus far by the Ninth Circuit, the commencement point of the limitation, or the precise blend of crime circumstances and years since, has not been defined. We do know that in Irons, five times of application was insufficient. Irons did not decide that reliance on unchanging factors after the minimum term had been served was unlawful. We simply know that "maybe" that will be the case.

[2] The Board of Prison Terms recently had its name changed to the Board of Prison Hearings.

– right after the conviction, just prior to expiration of a minimum term, well after the expiration of a minimum term.[3]

Review of the federal appellate cases demonstrates that no guided finding of undue reliance on unchanging factors can be made in this case. Biggs v. Terhune, supra, the case that commenced the discussion on unchanging factors, involved the first degree bludgeoning murder of a witness facilitated, but not committed, by Biggs. He was denied parole eligibility at his initial hearing in 1999 in part because of the gravity of the crime. All might agree that such a murder was grave, and it will never be properly classified as anything but such. Nevertheless, the Ninth Circuit found that "continued reliance" on unchanging factors could violate due process. Although not stating such, the intimation of Biggs was that the third or fourth time of reliance on the circumstances of the crime would be too much. Certainly, it was not understood by the undersigned from reading Biggs that the time at which continued reliance would be too much would occur in 2010 – the time at which Biggs will have served his minimum term. Biggs' minimum term is served in 2010, and Biggs will have had approximately 5 or 6 more hearings by that time. However, subsequent Ninth Circuit cases have not upheld the undersigned's reading of Biggs.

In Sass, no comparison review of other cases was undertaken, there was simply the one sentence holding that the "evidence of Sass' prior offenses [prior DUIs] and the gravity of his convicted offenses [DUI resulting in a death and injury] constitute some evidence to

---

[3] The undersigned has previously determined the arbitrary nature and lack of predictive value generally found in a circumstances of the crime parole suitability denial based on unchanging circumstances despite the passage of sixteen years and more from the date of the conviction coupled with an unblemished prison record. See Irons v. Warden of California State Prison-Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005). That analysis, focusing on the predictive nature of the crime for future violence in combination with expert psychiatric reports or other forward looking evidence, has been cited with approval by the California Court of Appeal. In re Elkins, 144 Cal. App. 4th 475, 50 Cal. Rptr. 3d 503, 522 (2006); In re Scott, 133 Cal. App. 4th 573, 34 Cal. Rptr. 3d 905 (2005). However, since that analysis only received the comment that it was an "understandable [AEDPA] error" in the concurrence of Judge Reinhardt, that analysis concerning the trigger time of undue reliance will not be utilized herein.

support the Board's decision." Id., 461 F.3d 1123; the dissent disagreed, and found AEDPA unreasonableness.  The Ninth Circuit was reviewing a third denial of suitability.  If jurists of the Ninth Circuit cannot agree whether the circumstances of the crime can constitute some evidence given three hearings, how will the BPH or the undersigned know when to stop using the circumstances of a crime as the reason to deny parole eligibility.  What will be the analytical watershed point of departure from routinely upholding the BPH assessment of the circumstances of the crime, and more importantly, why?  Will the fourth hearing be sufficient, or should it be the seventh?  Will the analysis simply hinge on the non-analytical fact that Sass will have passed his minimum terms of years under his sentence?  Would a later BPT finding of egregiousness be AEDPA unreasonable simply because Sass just passed his minimum term as opposed to just before the expiration of his minimum term?  None of these questions have been answered.

In Irons, after five parole suitability hearings, the Ninth Circuit determined that the second degree murder of a perceived thieving drug dealer by a wildly shooting, and then stabbing, angry "victim" of the deceased was comparatively more egregious than the murder in Sass.  Perhaps so; perhaps other jurists would locate this line in another position because of the societal impact that drunk drivers impose in this country.  Both positions have their points.  But one can validly question whether the ultimate goal of every parole eligibility hearing, determining *future* safety of the community, can forever be based on personal judgments on the comparative seriousness of crimes committed decades ago.

Nevertheless, taking an implied cue from Irons that the minimum term might serve as an analytical change point, the undersigned finds that prior to that time, absent extraordinary circumstances, the BPH determination on factors relating to the circumstances of the crime are essentially unreviewable, i.e., the determination constitutes "some evidence" sufficient to deny parole eligibility (suitability).

In the instant case, at the time of the 2004 hearing petitioner had served 13 years of his minimum term of 15 years.  Therefore, the BPH's reliance on two unchanging factors

related to the circumstances of the commitment offense constituted sufficient evidence sufficient to find petitioner unsuitable. See Answer, Exhibit 3, p. 59-60: petitioner found unsuitable because there were multiple victims, Cal. Code Regs. tit. 15, § 2402(c)(1)(A) (multiple victims attacked, injured or killed in the same or separate incidents tends to show unsuitability); petitioner found unsuitable because offense carried out in a manner demonstrating disregard for human suffering, § 2402(c)(1)(D) (offense carried out in a manner demonstrating a callous disregard for human suffering tends to show unsuitability).

While, for the reasons set forth above, the BPH determination of factors relating to the circumstances of the crime are essentially unreviewable, the court makes the following observations. This court considered petitioner's habeas petition challenging the sufficiency of the evidence in support of the BPH's finding of unsuitability at his 2002 initial suitability hearing, CIV S-03-2377 GEB GGH P.[4]  In this case, the 2002 panel found petitioner unsuitable based on factors related to the commitment offense *different* in part from those relied on by the 2004 panel. In particular, the 2002 panel found that the offense was carried out in a dispassionate and calculated manner (§ 2402(c)(1)(B)) and that the motive for the crime was trivial (§ 2402(c)(1)(E)). On February 17, 2005, this court found that there was sufficient evidence of these factors to support the 2002 panel's decision. On April 11, 2005, the Honorable Garland E. Burrell adopted these findings and recommendations.

As discussed above, the 2004 panel found petitioner unsuitable in part because there were multiple victims involved. The evidence showed that petitioner shot in the direction of both Tupas and Martinez, but only Tupas was shot. The 2004 panel apparently found that Martinez was a victim of petitioner's shooting, although he was not shot. This court notes that petitioner was not convicted of any crime relating to the alleged shooting of Martinez, such as

---

[4] Judicial notice may be taken of court records. Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981).

attempted murder.  Therefore, whether there were truly multiple victims involved in petitioner's offense as defined by § 2402(c)(1)(A) is not sustainable, as evidenced by the failure of the 2002 panel to find petitioner unsuitable on this ground.  However, the other grounds of "exceptionally violent and brutal" and "disregard for human life," essentially a matter of opinion, are unreviewable conclusions under present law.

In actuality, some of the facts favor petitioner.  After the immature verbal confrontation commenced being physical, petitioner may well have been initially in fear of his life, i.e., being approached by multiple males one of whom was using a bottle as a weapon.  Of course, when some ran away, and petitioner was being merely taunted by the two remaining gang members, that fear should have evaporated, but one can easily imagine that the initial aggressive/defensive turmoil within was still in play.  Perhaps this interpretation is flawed, but it demonstrates the point to be made clearly.

Perhaps the better question to ask the BPT (BPH) is what murders do not show a disregard for human life – the undersigned cannot think of many, if any.  Situations which come to mind are not, by definition, murder.  Similarly, what distinguishes this crime in terms of brutality from any other murder?  The factors for parole suitability which focus on the gravity of the crime are susceptible to a myriad of personal interpretations, and when the focus of parole suitability, years after the unfortunate event, give the BPH commissioners the opportunity to re-sentence, i.e., the factors regarding the commitment offense can be mechanically applied forever whenever a commissioner determines that he or she was offended by the crime.  Sentencing for the crime becomes a legal *Groundhog Day*.  The state statutory focus of parole eligibility on future danger if released is lost among the personal opinions on the gravity of the offense.  One might think that the only time and place for determination of the gravity of the crime is at sentencing after plea or conviction, but that is evidently not the case.[5]

---

[5] If the crime is so offensive, in realistic, relative terms – so offensive, that fifteen years afterwards, one could be truly concerned about the safety of the community if the person were to

Notwithstanding the above, under current Ninth Circuit law, the BPH's idea of the severity of the offense can constitute "some evidence."

Because circumstances of the crime alone can constitute some evidence, there is no point in discussing the other factors of parole suitability, and whether some evidence existed for the conclusions reached in the other factors by the BPT.

This claim should be denied.

B. Claims Barred by Res Judicata: Claims 2, 6

In claim two, petitioner argues that the BPH's "relitigation" of the factors relating to his commitment offense violates the Double Jeopardy Clause. In claim six, petitioner argues that BPH violates the federal doctrine of separation of powers by setting (or failing to set) parole dates because it is determining terms of imprisonment, a judicial function. Petitioner raised both of these claims in his previous petition, CIV S-03-2377 GEB GGH P. The court denied these claims on the merits. See February 17, 2005, Findings and Recommendations, adopted by District Court on April 11, 2005.

Pursuant to the doctrine of res judicata, petitioner is barred from raising these claims which were previously litigated and decided against him in his prior habeas action. Hawkins v. Risley, 984 F.2d 321, 325 (9th Cir. 1993). Accordingly, the court will not address these claims.

C. Sentence Violates Eighth Amendment: Claim 5

Petitioner argues that he has now been in prison for 14 years, and that this period of incarceration is disproportionate to his culpability. As discussed above, petitioner was

---

be released based solely on the severity of the past crime, the only appropriate sentence is life imprisonment *without* the possibility of parole. Moreover, a sentencing scheme which disallowed all parole for any murder would be constitutionally beyond attack. See § 18 U.S.C. 1111(b) (sentence for second degree murder can be imposed for life (and federal system has no parole). The present system eschews this certainty for one based on personal and varied opinion about past crime severity formed years after the fact of sentencing having little to do with the state statutory parole eligibility mandate which is focused on forward looking criteria.

sentenced to 15 years to life.  The 2004 decision by the BPH finding him unsuitable is not keeping him in prison any longer than his sentence.  For this reason, the court finds petitioner's claim unmeritorious.

If petitioner is claiming that his actual sentence is disproportionate to his culpability, he is really challenging the sentence imposed by the Superior Court following his conviction.  Petitioner must file a separate habeas corpus petition if he intends to pursue this claim.  See Rule 2(e), Federal Rules Governing Section 2254 Cases (a petitioner seeking to relief from judgments of more than one state court must file a separate petition covering the judgment of each court).

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 11/19/07

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

lan1008.157